UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

| | |
|---|---|
| BRIAN MEARS and DAISY SHAFFER, individually and on behalf of all others similarly situated, | Case No.: |
| | **<u>CLASS ACTION COMPLAINT</u>** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| U.S. XPRESS ENTERPRISES, INC. | |
| Defendant. | |

1

Plaintiffs Brian Mears and Daisy Shaffer ("Plaintiffs"), individually and on behalf of Classes (defined below) of similarly situated persons, bring this Complaint and allege the following against U.S. Xpress Enterprises, Inc. ("USX" or "Defendant"), based upon personal knowledge as to themselves, and on information and belief as to all other matters.

## NATURE OF THE ACTION

1.     This is a putative class action lawsuit brought against USX for its failure to properly secure and safeguard the personally identifiable information ("PII") of employees, job applicants and others in USX's computer systems. [1]

2.     On April 9, 2020, USX sent letters to the Plaintiffs along with employees, job applicants and others who had occasion to provide their PII to USX and whose information had been compromised and exfiltrated by unauthorized third parties. The letter informed recipients that a USX employee fell for a phishing campaign, the result of which was a third party acquiring unauthorized access to USX computer systems. Thereafter, the unauthorized third party was able to view, access and exfiltrate sensitive PII stored in USX's systems. The PII included names, Social Security numbers and driver license numbers ("Data Breach").

3.     USX acknowledged that the Breach was the result of one of its employees falling for a common place phishing attack—one of the oldest, well known, and easiest to prevent cyber incursions.

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

4. Although the Data Breach occurred in September 2019, inexplicably USX failed to provide notice to affected Class Members until April 2020.

5. Without question, the Data Breach could have bene prevented by USX had it employed sufficiently robust cyber security measures, including training its employees to recognize and avoid phishing expeditions. USX also had the ability to timely notify affected individuals. Instead, USX disregarded the rights of Plaintiffs and Class Members (defined below) by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected; failing to disclose the material fact that it neither had adequate security practices, nor sufficient safeguards in place to protect the PII with which it was entrusted; failing to take available steps to prevent the Data Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiffs and putative Class Members prompt and accurate notice of the Data Breach.

6. As a result of Defendant's failure to implement and follow standard security procedures, Plaintiffs' and Class Members' PII is in the hands of thieves. Plaintiffs and Class Members now face an increased risk of identity theft and will have to spend significant amounts of time and money to protect themselves. Indeed, as detailed below, Plaintiffs have already suffered financial harm and adverse credit events as a result of the Data Breach and have expended time in an effort to mitigate its deleterious effects.

7. Plaintiffs, on behalf of themselves and Classes of similarly situated individuals, seek to remedy the harms suffered as a result of the Data Breach and to ensure that their PII, which remains in the possession of Defendant, is protected from further breaches.

8. Defendant's conduct gives rise to claims for negligence, negligence per se, breach of implied contract, breach of confidence, and violation of the Florida Deceptive and Unfair

3

Trade Practices Act. Plaintiffs, individually, and on behalf of those similarly situated, seek damages, equitable relief, injunctive relief, restitution, and all other remedies this Court deems proper.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) ("CAFA"), as the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, there are more than 100 Class Members, a number of whom are citizens of states different from that of the Defendant.

10.      This Court has personal jurisdiction over Defendant because USX is headquartered in Tennessee, regularly conducts business in this District, and maintains its principal place of business in this District.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the Defendant's principal places of business is in this District and a substantial part of the events or omissions giving rise to this action, particularly decisions related to data security and the acts which lead to the Data Breach, occurred in this District.

## PARTIES

12.      Plaintiff Brian Mears is a citizen and resident of Volusia County, Florida. On or about April 9, 2020, Mr. Mears received a notice from USX stating that his sensitive PII, specifically his name, Social Security number and driver's license number had been exposed in a Data Breach.[2]

13.      Mr. Mears is neither an employee, nor a customer of USX. Indeed, his only

---

[2] Letter from U.S. Xpress to Brian Mears, April 9, 2020 ("Notice") attached hereto as Exhibit A.

4

relationship to USX is as a current litigant against the Company. On April 6, 2017, Plaintiff was kneeling down to work on a gas tank located at a Travel Center in Calhoun County, South Carolina, when a U.S. Xpress drove over his feet. Mr. Mears filed a personal injury lawsuit against USX on or about July 18, 2019. In the course of that litigation, USX requested and acquired documents that contained Mr. Mears' sensitive PII. Upon information and belief, those documents were stored on USX's systems which were subsequently compromised in the Data Breach.

14. Upon receiving notice from USX, Mr. Mears contacted all three credit bureaus and placed freezes on his credit report. He reviewed bank statements and initiated fraud protection services through his bank. Mr. Mears also enrolled in credit monitoring services provided by Experian.

15. Mr. Mears has, and continues to spend his valuable time to protect the integrity of his finances and credit—time which he would not have had to expend but for the Data Breach.

16. Mr. Mears suffered actual injury from having his PII exposed as a result of the Data Breach, including, but not limited to, damages to and diminution in the value of his PII—a form of intangible property that the Plaintiff entrusted to USX, and imminent and impending injury arising from the increased risk of fraud and identity theft..

17. As a result of the Data Breach, Mr. Mears will continue to be at heightened risk for financial fraud and identity theft, and their attendant damages for years to come.

18. Plaintiff Daisy Shaffer is a citizen and resident of Columbia County, Florida. On or about April 9, 2020, Ms. Shaffer received a notice from USX stating that her sensitive PII, specifically her name and Social Security number had been exposed in the Data Breach.

19. Ms. Shaffer is neither an employee nor a customer of USX. Ms. Shaffer applied to

drive for USX. As part of that application process, and to be considered for a job, she was required to provide USX her name, Social Security number and other PII.

20.     On or about March 19, 2020, Ms. Shaffer was contacted by her bank which indicated that her account had been subject to fraud and needed to be closed. Upon information and belief, the fraud was a result of the exposure of her sensitive PII in the Data Breach. Subsequent to receiving a notice from USX, Ms. Shaffer has, and continues to spend her valuable time to protect the integrity of her finances and credit—time she would not have had to expend but for the Data Breach.

21.     Ms. Shaffer suffered actual injury from having her PII exposed as a result of the Data Breach including, but not limited to damages to and diminution in the value of her PII—a form of intangible property that the Plaintiff entrusted to USX, and imminent and impending injury arising from the increased risk of fraud and identity theft.

22.     As a result of the Data Breach, Ms. Shaffer will continue to be at heightened risk for financial fraud and identity theft, and their attendant damages for years to come.

23.     Defendant U.S. Xpress Enterprises, Inc. is a Nevada corporation headquartered at 4080 Jenkins Road, Chattanooga, Tennessee. USX is the fifth-largest asset-based truckload carrier by revenue in the United States, consisting of 7,000 tractors and 15,500 trailers. It employs over 10,000 people and has annual revenues in excess of $1 billion.[3]

## FACTUAL ALLEGATIONS

### A. *USX Acquires, Collects and Stores Plaintiffs' and Class Members' PII*

24.     Defendant acquires, collects, and stores a massive amount of personally

---

[3] https://www.usxpress.com/about/

6

identifiable information.

25.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, USX assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

26.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiffs and the Class Members relied on USX to keep their PII confidential and securely maintained, to use this information for intended business purposes only, and to make only authorized disclosures of this information.

*B. The USX Data Breach*

27.     In September 2019, a USX employee fell for an email phishing scam which resulted in the unauthorized access to the individual's email account, which purportedly contained the sensitive PII belonging to Plaintiffs and Members of the Class.

28.     USX became aware of the Breach no later than October 2019 and, according to the notice sent to Plaintiffs, was provided a list of affected Class Members on February 21, 2020. The sensitive PII exfiltrated in the Breach included names, Social Security numbers and driver's license numbers.

29.     On April 9, 2020, USX disseminated notice of the Data Breach by U.S. Mail to Plaintiffs and Members of the Class. The Notice states in relevant part:

> U.S. Xpress *Enterprises,* Inc. ("USX") is notifying you of an incident that may have involved your personal information.
>
> Recently, an employee of one of our subsidiaries fell victim to an email phishing scam by opening an attachment/link containing malware—which eventually allowed unauthorized access to the individual's email account. The email account accessed contained some of your personal information.

7

USX investigated this incident internally and the unauthorized access was promptly blocked. USX also engaged outside technical experts to further investigate in order to evaluate the full nature and scope of any potential access.

On October 18, 2019, we were alerted by the outside experts as to the extent of the intrusion, and that the unauthorized access may have first occurred in September 2019. From there, we then conducted an extensive document review (which involved the tedious process of hand reviewing individual emails and attachments) in order to be able to identify individuals who potentially needed to be notified of this incident. These same emails were also reviewed to obtain names for use in notification.

On February 21, 2020 we were provided the listing of affected individuals, and from that listing we were first alerted that the information potentially involved included your name, Social Security number, and driver's license number. From there, we began the process of notifying potentially-affected individuals, including compiling mailing addresses.

We recommend you take precautions, and we are offering you one (1) year of free credit monitoring and $1 million in *identity* theft *insurance* through Experian—to give you peace of mind. You must activate the Experian product by the *activation date* in order for it to be effective. The activation instructions are included with this notification. We also have *included* some additional steps that you can take to help protect yourself, as you deem appropriate.

For more information about this incident, call toll-free 1-888-921-0490 between 8:00 a.m.- 5:30 p.m. Central Time Monday - Friday (excluding some U.S. holidays). USX is continuing to take steps to enhance its security measures to help prevent something like this from happening in the future. We are fully committed to safeguarding your personal information and sincerely apologize for any concern this incident may have caused you.[4]

### C. *Prevalence of Data Breaches and Phishing Attacks*

30.     Cyber-attacks come in many forms. Phishing attacks are among the oldest, most common, and well known. In simple terms, phishing is a method of obtaining personal information using deceptive e-mails and websites. The goal is to trick an e-mail recipient into

---

[4] Exhibit A

believing that the message is something they want or need from a legitimate or trustworthy source and to subsequently take an action such as clicking on a link or downloading an attachment. The fake link will typically mimic a familiar website and require the input of credentials. Once input, the credentials are then used to gain unauthorized access into a system. "It's one of the oldest types of cyberattacks, dating back to the 1990s" and one that every organization with an internet presence is aware.[5] It remains the "simplest kind of cyberattack and, at the same time, the most dangerous and effective."[6]

31.     Phishing attacks are well known and understood by the cyber-protection community and are generally preventable with the implementation of a variety of proactive measures such as sandboxing inbound e-mails[7], inspecting and analyzing web traffic, penetration testing[8], and employee education, among others.

---

[5] *What is phishing? How this cyber attack works and how to prevent it*, CSO, Aril 7, 2020, available at https://www.csoonline.com/article/2117843/phishing/what-is-phishing-how-this-cyber-attack-works-and-how-to-prevent-it.html (last visited April 30, 2020)

[6] *Phishing*, Malwarebytes, available at https://www.malwarebytes.com/phishing/ (last visited April 30, 2020)

[7] An automated process whereby e-mails with attachments and links are segregated to an isolated test environment, a "sandbox," wherein a suspicious file or URL may be executed safely.

[8] *See*, https://searchsecurity.techtarget.com/definition/penetration-testing (The practice of testing a computer system, network or web application to find security vulnerabilities that an attacker could exploit. The main objective of penetration testing is to identify security weaknesses. Penetration testing can also be used to test an organization's security policy, its adherence to compliance requirements, its employees' security awareness and the organization's ability to identify and respond to security incident. The primary goal of a pen test is to identify weak spots in an organization's security posture, as well as measure the compliance of its security policy, test the staff'' awareness of security issues and determine whether—and how—the organization would be subject to security disasters.)

9

32.     In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a

forty percent increase in the number of data breaches from the previous year.[9]  The number of

annual data breaches have remained in the thousands ever since, reaching a record high of 1,579

breaches reported in 2017.[10]

33.     According to the Identity Theft Resource Center Report, in 2019 business sector

data breaches exposed over 18 million sensitive records.[11] There were 644 breaches for the year,

up from 576 breaches in 2018. *Id.* Among the five industry sectors covered by the 2019 Report,

the business sector suffered the largest number of breaches. Critically, among the various

methods by which data breaches are perpetrated, intrusions by phishing ranked among the

highest. *Id.*

### D. The Value of Personally Identifiable Information and the Effects of Unauthorized Disclosure

34.     PII has become a valuable commodity among hackers. Once obtained, it is

quickly sold on the black market where it can often be re-traded among miscreants for years.[12]

PII is particularly valuable to identity thieves who can use victims' personal data to open new

financial accounts, take out loans, incur charges, or clone ATM, debit, and credit cards.

---

[9] *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, Identity Theft Resource Center, January 19, 2017, *available at* https://www.idtheftcenter.org/surveys-studys (last visited April 30, 2020).

[10] 2017 Annual Data Breach Year-End Review, Identity Theft Resource Center, available at https://www.idtheftcenter.org/2017-data-breaches/ (last visited April 30, 2020).

[11] 2019 End-of-Year Data Breach Report, Identity Theft Resource Center available at https://www.idtheftcenter.org/2019-data-breaches/ ("2019 Report")(last visited April 30, 2020).

[12] *Guide for Assisting Identity Theft Victims*, FTC, September 2013, available at https://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf (the "FTC Guide").

35.     Professionals tasked with trying to stop fraud and other misuse know that PII has real monetary value as evidenced by criminals' relentless efforts to obtain this data.[13]

36.     As the FTC recognizes, with PII identity thieves can commit an array of crimes including identify theft, medical and financial fraud.  Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites.

37.     Social Security numbers are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

38.     Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the

---

[13] *Data Breaches Rise as Cybercriminals Continue to Outwit IT*, *CIO Magazine*, September 24, 2014, available at _https://www.cio.com/article/2686167/data-breach/data-breaches-rise-as-cybercriminals-continue-to-outwit-it.html (last visited April 30, 2020).

old number, so all of that old bad information is quickly inherited into the new Social Security number."[14]

39.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market." [15]

40.     The ramifications of USX's failure to keep PII entrusted to it secure, are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may be long lasting. "The repercussions of a breach can be very delayed, sometimes not fully manifesting for years."[16]

41.     At all relevant times, USX knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences if its data security systems were breached, including, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

*E.  USX's Privacy Policies and Promises to Keep PII Confidential*

42.     USX acquired the sensitive PII of Plaintiffs and Class Members through various means and was subsequently maintained by USX in the ordinary course of its business.

---

[14] *Victims Of Social Security Number Theft Find It's Hard To Bounce Back*, NPR, February 9, 2015, available at https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited on April 30, 2020).

[15] *Anthem hack: Personal data stolen sells for 10X price of stolen credit card numbers*, Network World, February 6, 2015, available at https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited April 30, 2020).
[16] *The WIRED Guide to Data Breaches*, Wired, December 7, 2018, available at https://www.wired.com/story/wired-guide-to-data-breaches/ (last visited April 30, 2020).

12

43.     Fundamentally, USX recognized the sensitivity of PII it acquires from others and

its obligation to maintain such PII securely. As reflected in its online Privacy Policy:

How do we protect your information?

We implement a variety of security measures including generally accepted
information security techniques such as firewalls and access control procedures to
maintain the safety of your personal information. All supplied sensitive
information can only be accessed by those authorized with special access rights to
our systems, and are required to keep the information confidential…..

Social Security Numbers.

We value your trust and we are committed to the responsible protection of your
Social Security number ("SSN"). SSN's are used to distinguish between new and
existing applicants, obtain and verify work history, and collect statistically
accurate data in order to qualify applicants for a possible position with the
company. As further described herein, we limit access to SSN's by granting
access to only those employees who use the information to perform their job-
related duties. In addition, we do not disclose SSN's to third parties, except where
required or permitted by law. We comply with all applicable statutes and policies
in regards to protecting the privacy and security of the information we collect. [17]

44.     As further publicly confirmed in its Annual Report for 2019:

We also maintain information security policies to protect our systems, networks
and other information technology assets (and the data contained therein) from
cybersecurity breaches and threats, such as hackers, malware and viruses. [18]

45.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and the

Class Members' PII, Defendant assumed legal and equitable duties to those individuals and knew

---

[17] https://www.usxpress.com/privacy-policy/

[18] See, U.S. Xpress Enterprises Inc., Annual Report Pursuant to Section 13 or 15(D) of the
Securities Exchange Act of 1934, For the fiscal year ended December 31, 2019, available at
https://www.sec.gov/Archives/edgar/data/923571/000155837020002028/usx-20191231x10k.htm
(last visited April 30, 2020)

13

or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

46.     At all relevant times, Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential, to use it for business purposes only, and to make only authorized disclosures of this information.

47.     Despite espousing the importance of securing PII with which it was trusted, USX failed to implement or maintain the most basic procedures and protocols necessary to achieve this goal.

### F. USX Failed To Comply With FTC Guidelines and Industry Best Practices

48.     In 2018, 446,515,334 records containing sensitive personally identifiable information were exposed, reflecting a 126 percent increase from 2017.[19] Hacking was the most prevalent cause of data breaches in 2018 and the business sector had the highest number of reported breaches of any sector. *Id*. In 2019, the business industry again posted the highest number of reported breaches of any sector.[20] As a result, both the federal government and the private sector have disseminated a non-comprehensive list which serve as a base line for businesses to employ in an effort to prevent data breaches for occurring, and in the event that a breach does occur, to mitigate potential damages.

---

[19] *2018 End of Year Data Breach Report*, Identity Theft Resource Center, available at https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf (last visited April 30, 2020)

[20] 2019 report, *supra* at n. 11.

49. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

50. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

51. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

52. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet

15

their data security obligations.

53.     The prevalence of data breaches has also prompted private industry to identify the most common causes of data breaches and develop best practices to be employed to avert such breaches.

54.     Not surprisingly, the most common organizational vulnerability that lead to a data breach were its employees whose lack of understanding of security policies and procedure made them susceptible to phishing emails and other forms of social engineering.[21] The very same issue that resulted in the USX Data Breach.

55.     Best practices include, but are not limited to: properly training employees to identify and avoid social engineering such as phishing emails and malicious links, Ensuring robust intrusion detection systems, timely patching of vulnerabilities, configuring and reviewing intrusion logs. Moreover, networks should be segmented and isolated by firewalls and access to sensitive data should be restricted to only those employees who need access to complete their jobs. *Id.*

56.     USX was at all times fully aware of its obligation to protect the PII of Plaintiffs and Class Members and of the significant repercussions that would result from its failure to do so.

Commented [KR1]: Do we mean to limit this to investors' information? Because I think it makes the reader wonder if USX had any duty to the Plaintiffs and Class members who were not investors.

57.     USX failed to properly implement basic data security practices. USX's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC

---

[21] *Security Trends: Data Breach Statistics From 2018 and Predictions For 2019,* Security Metrics, available at https://www.securitymetrics.com/blog/security-trends-data-breach-statistics-2018-and-predictions-2019 (last visited April 30, 2020).

Act, 15 U.S.C. § 45.

### G. Plaintiffs and Class Members Suffered Damages

58.     The ramifications of Defendant's failure to keep PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. Victims of data breaches are more likely to become victims of identity fraud.[22]

59.     The PII belonging to Plaintiffs and Class Members is private, sensitive in nature, and was left inadequately protected by Defendant.

60.     The Data Breach was a direct and proximate result of USX's failure to: (a) properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

61.     Defendant posted annual revenues of  more than a billion dollars and clearly had the resources necessary to prevent the Breach, but neglected to adequately invest in data security measures, despite its obligation to protect Plaintiffs' and Class Members' PII.

62.     Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into its systems and, ultimately, the theft of PII.

63.     As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they

---

[22] *2014 LexisNexis True Cost of Fraud Study*, LexisNexis, August 2014, available at https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last visited April 30, 2020).

17

otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[23]

64.    To date, USX has only offered credit monitoring for one year."[24]  The offer, however, is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and it entirely fails to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII.

65.    Furthermore, Defendant's credit monitoring offer to Plaintiffs and Class Members squarely places the burden on Plaintiffs and Class Members, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring services upon discovery of the breach, Defendant merely sent instructions offering the services to Class Members.

66.    As a result of the Defendant's failures to prevent the Data Breach, Plaintiffs and Class Members have suffered, will suffer, or are at increased risk of suffering:

       a.    The compromise, publication, theft and/or unauthorized use of their PII;

       b.    Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

---

[23] *Victims of Identity Theft, 2012*, U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics December 2013 available at https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited April 30, 2020).

[24] Exhibit A.

18

c. Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

d. The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII in its possession; and

e. Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

67. In addition to a remedy for the economic harm, Plaintiffs and the Class maintain an undeniable interest in ensuring that their PII is secure, remains secure, and is not subject to further misappropriation and theft.

**H. *Defendant's Delay in Identifying & Reporting the Data Breach Caused Additional Harm***

68. It is axiomatic that "[t]he quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."[25]

---

[25] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire¸ February 1, 2017, available at https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million (last visited April 30, 2020).

69.     Indeed, once a data breach has occurred, "[o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves" (internal citations omitted).[26]

70.     Although the Data Breach occurred in September 2019 USX took six months to notify those affected, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

71.     While the April 9th Notice sent to Plaintiffs indicates that USX was not "provided the listing of affected individuals" until February 21, 2020, this representation stands in stark contrast to a notice USX sent to the Vermont Attorney General months earlier regarding the same Data Breach in which it represented that the list of affected individuals was presented to USX on September 30, 2020.[27]  The notice was sent to the Vermont Attorney General on or about November 15, 2019. USX provides no explanation for this discrepancy, or why it delayed informing Plaintiffs and Members of the Class that their sensitive PII had been compromised.

72.     As a result of USX's delay in detecting and notifying Plaintiffs and Class Members of the Data Breach, the risk of fraud for Plaintiffs and Class Members has been driven even higher.

---

[26] *The Data Breach Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too*, Consumer Reports, January 31, 2019, https://www.consumerreports.org/data-theft/the-data-breach-next-door/ (last visited April 30, 2020)

[27] U.S. Xpress Enterprises, Inc. Notice of Data Breach to Consumers, Office of the Vermont Attorney General, November 15, 2019, available at https://ago.vermont.gov/blog/2019/11/15/u-s-xpress-enterprises-inc-notice-of-data-breach-to-consumers/ (last visited April 30, 2020)

## CLASS ACTION ALLEGATIONS

73.     Plaintiffs bring this suit as a class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), (b)(3) and (c)(4) of the Federal Rules of Civil Procedure. Plaintiffs seek certification of a Nationwide and a Florida Sub Class as defined below:

> All persons residing in the United States whose PII was exposed in the USX Data Breach ("Class").

> All persons residing in the state of Florida whose PII was exposed in the USX Data Breach of April 1, 2019 ("Florida Sub Class").

74.     Excluded from the Classes are the officers, directors, and legal representatives of Defendant, and the judges and court personnel in this case and any Members of their immediate families.

75.     <u>Numerosity</u>. Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all Members is impractical. While the exact number of Class Members is unknown to Plaintiffs at this time, upon information and belief, the Breach affected thousands of individuals. The exact number is generally ascertainable by appropriate discovery as Defendant has knowledge of the individuals whose PII was breached.

76.     <u>Commonality</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs Class Members;

b.   Whether Defendant was negligent in collecting and storing Plaintiffs' and Class

21

Members' PII;

c. Whether Defendant had a duty not to disclose Plaintiffs' and Class Members' PII to unauthorized third parties;

d. Whether Defendant took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PII;

e. Whether Defendant failed to adequately safeguard Plaintiffs' and Class Members' PII;

f. Whether Defendant breached its duty to exercise reasonable care in handling Plaintiffs' and Class Members' PII;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether implied contracts existed between USX, on the one hand, and Plaintiffs and Class Members on the other;

i. Whether Defendant had a duty to refrain from using the PII of Class Members for non-business purposes;

j. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

k. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Class Members;

l. Whether Plaintiffs and Class Members are entitled to actual, damages, statutory damages, and/or punitive damages as a result of Defendant's wrongful conduct;

m. Whether Plaintiffs and Class Members are entitled to restitution as a result of

22

Defendant's wrongful conduct; and,

n.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

77.  <u>Typicality</u>. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was disclosed by Defendant. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Members of the Class were injured through the common misconduct of Defendant. Plaintiffs are advancing the same claims and legal theories on behalf of himself and all other Class Members, and there are no defenses that are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

78.  <u>Policies Generally Applicable to the Class</u>. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

79.  <u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have

retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

80. <u>Superiority of Class Action</u>. Fed. R. Civ. P. 23(b)(3). The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

81. The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

82. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

83. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

84. Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

85. Unless a Class-wide injunction is issued, Defendant may continue to act unlawfully as set forth in this Complaint.

86. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, using, and safeguarding their PII;

    b.    Whether Defendant breached a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, using, and safeguarding their PII;

    c.    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

    d.    Whether an implied contract existed between Defendant and Members of the Class and the terms of that implied contract;

    e.    Whether USX breached the implied contract;

f.   Whether Defendant timely, adequately, and accurately informed Class Members that their PII had been compromised;

g.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Class Members; and,

i.   Whether Class Members are entitled to actual damages, statutory damages, injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## FIRST CAUSE OF ACTION
### Negligence

87.   Plaintiffs restate and reallege paragraphs 1 through 86 above as if fully set forth herein.

88.   As a condition of their relationship with USX, Plaintiffs and Class Members were obligated to provide Defendant with certain PII, including their names, Social Security numbers and/or driver's license numbers.

89.   Plaintiffs and the Class Members entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

90.   Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

91.   Defendant knew or reasonably should have known that the failure to exercise due

26

care in the collecting, storing, and using of individuals' PII involved an unreasonable risk of harm to Plaintiffs and Class Members, even if the harm occurred through the criminal acts of a third party.

92.　　Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing its security protocols to ensure that Plaintiffs and Class Members' information in Defendant's possession was adequately secured and protected, and that employees tasked with maintaining such information were adequately trained on security measures regarding the security of PII entrusted to it.

93.　　Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and Class Members' PII.

94.　　A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class Members was reasonably foreseeable, particularly in light of Defendant's inadequate information security practices.

95.　　Plaintiffs and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, and that it had inadequate employee training and education and IT security protocols in place to secure the PII of Plaintiffs and the Class.

96.　　Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct

27

also included its decisions not to comply with industry standards for the safekeeping of the PII of Plaintiffs and Class Members.

97.     Plaintiffs and the Class Members had no ability to protect their PII that was in Defendant's possession.

98.     Defendant was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

99.     Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of information that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

100.     Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and Class Members.

101.     Defendant has admitted that the PII of Plaintiffs and Class Members was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

102.     Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and Class Members during the time the PII was within Defendant's possession or control.

103.     Defendant improperly and inadequately safeguarded the PII of Plaintiffs and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

104.     Defendant failed to heed industry warnings and alerts to provide adequate

28

safeguards to protect customers' PII in the face of increased risk of theft.

105. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of their customers' PII.

106. Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and Class Members the existence and scope of the Data Breach.

107. But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the PII of Plaintiffs and Class Members would not have been compromised.

108. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Class Members, and the harm suffered, or risk of imminent harm suffered by Plaintiffs and the Class. Plaintiffs' and Class Members' PII was stolen and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures and encryption.

109. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud

Commented [KR2]: Don't we define the class as larger than just customers?

29

and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

110. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

### SECOND CAUSE OF ACTION
**NEGLIGENCE *PER SE***

111. Plaintiffs restate and reallege Paragraphs 1 through 86 as if fully set forth herein.

112. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as USX, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

113. USX violated Section 5 of the FTC Act by failing to use reasonable measures to protect patient PII and not complying with applicable industry standards, as described in detail herein. USX's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

114. USX's violation of Section 5 of the FTC Act constitutes negligence *per se*.

30

115.     Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

116.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

117.     As a direct and proximate result of USX's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to: damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and medical accounts, closely reviewing and monitoring their credit reports and various accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if not years to discover and detect.

118.     Additionally, as a direct and proximate result of USX's negligence *per se*, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remains in USX's possession and is subject to further unauthorized disclosures so long as USX fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

## THIRD CAUSE OF ACTION
### BREACH OF CONFIDENCE

119.     Plaintiffs restate and reallege paragraphs 1 through 86 above as if fully set forth herein.

120. At all times during Plaintiffs' and Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' PII.

121. As alleged herein and above, Defendant's relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

122. Plaintiffs and Class Members provided their PII to Defendant with the explicit and implicit understandings that Defendant would protect it and not permit their PII to be disseminated to any unauthorized parties.

123. Plaintiffs and Class Members also provided their PII to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect such PII from unauthorized disclosure.

124. Defendant voluntarily received in confidence Plaintiffs' and Class Members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unauthorized third parties.

125. Due to Defendant's failure to prevent, detect, or avoid the Data Breach from occurring by, *inter alia*, following industry standard information security practices to secure Plaintiffs' and Class Members' PII, Plaintiffs' and Class Members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

126. As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and Class Members have suffered damages.

127. But for Defendant's disclosure of Plaintiffs' and Class Members' PII in violation of the parties' understanding of confidence, their protected PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's

Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' protected PII, as well as the resulting damages.

128.    The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and Class Members' PII.

129.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from medical fraud, financial fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and Class Members in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

130.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have suffered and will continue to suffer injury and/or harm.

## FOURTH CAUSE OF ACTION
### Breach of Implied Contract

131.    Plaintiffs restate and reallege paragraphs 1 through 86 above as if fully set forth herein.

132.    Plaintiffs and Class Members provided their PII, including their names, Social Security numbers and driver's license numbers to Defendant as a condition of relationship with Defendant.

133.    In their written privacy policy, USX expressly promised that it would protect the integrity of PII disclosed to it and further only disclose PII under certain circumstances, none of which relate to the Data Breach.

134.    Implicit in the agreements between the Defendant and Plaintiffs and Class Members, was Defendant's obligation to use PII for business purposes only, take reasonable steps to secure and safeguard PII, and not make unauthorized disclosures of such data to unauthorized third parties.

135.    Further, implicit in the agreement, Defendant was obligated to provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their protected PII.

136.    Without such implied contracts, Plaintiffs and Class Members would not have provided and/or authorized the release of their PII to Defendant.

137.    Defendant had an implied duty to reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses.

138.    Additionally, Defendant implicitly promised to retain this PII only under

34

conditions that kept such information secure and confidential.

139.   Plaintiffs and Class Members fully performed their obligations under the implied contract with Defendant; however, Defendant did not.

140.   Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs and Class Members' PII, which was compromised as a result of the Data Breach.

141.   Defendant further breached the implied contracts with Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' PII.

142.   Defendant's failures to meet these promises constitute breaches of the implied contracts.

143.   Because Defendant allowed unauthorized access to Plaintiffs' and Class Members' PII and failed to safeguard the PII, Defendant breached their contracts with Plaintiffs and Class Members.

144.   Defendant breached its contracts by not meeting the minimum level of protection of Plaintiffs' and Class Members' protected PII.

145.   Furthermore, the failure to meet its confidentiality and privacy obligations resulted in Defendant providing goods and services to Plaintiffs and Class Members that were of a diminished value.

146.   As a direct and proximate result of Defendant's breach of their implied contracts with Plaintiffs and Class Members, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud,

35

and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers in their continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

147.    As a direct and proximate result of Defendant's breach of its implied contracts with Plaintiffs and Class Members, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs on behalf of themselves and all others similarly situated, pray for relief as follows:

a.    For an Order certifying the Class as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

b.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and the Class Members' PII, and from refusing to issue prompt, complete, and accurate

36

disclosures to Plaintiffs and Class Members;

c. For equitable relief compelling Defendant to use appropriate cyber security methods and policies with respect to PII collection, storage, and protection, and to disclose with specificity to Plaintiffs and Class Members the type of PII compromised;

d. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

e. For an award of punitive damages;

f. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

g. For prejudgment interest on all amounts awarded; and

h. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: June 5, 2020                           Respectfully submitted,

_____/s/ Kathryn E. Barnett_____
KATHRYN E. BARNETT (BPR#15361)
**MORGAN & MORGAN – NASHVILLE, PLLC**
810 Broadway, Suite 105
Nashville, Tennessee 37203
**PHONE:** (615) 490-0943
**EMAIL:** kbarnett@forthepeople.com

_/s/ Jean S. Martin_____
JEAN S. MARTIN (*Pro Hac Vice* Pending)
*jeanmartin@ForThePeople.com*
FRANCESCA KESTER (*Pro Hac Vice* Pending)
*fketster@ForThePeople.com*
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**

37

201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

*Attorneys for Plaintiffs and the Proposed Class*

38